**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION**

**TRYON P. SISSON, et al.,**

                **Plaintiffs,**

**v.**                                  **Case No. 3:20-cv-05101-BP**

**MANISH PATEL, et al.,**

                **Defendants.**

**PLAINTIFFS' SUGGESTIONS IN OPPOSITION TO
THE MITRA DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Tryon P. Sisson, Shanon G. Sisson, Tryon N. Sisson and Dolores A. Sisson submit the following suggestions in opposition to The Mitra Defendants' Motion for Summary Judgment (Doc. #101), filed October 22, 2021.

1

# Table of Contents

Table of Authorities ................................................................................................................3

Responses to Defendants' Statement of Facts ........................................................................5

Statement of Additional Uncontroverted Material Facts .......................................................21

Introduction ...........................................................................................................................31

Argument and Authorities .....................................................................................................31

    I.    Plaintiffs have Standing to Sure for Breach of the Leases ...........................................31

    II.   Manish Patel and Pushpak Patel are Not Entitled to Summary Judgment on Plaintiffs' Theory of Liability Based on Piercing the Corporate Veil ....................34

    A.    Veil-Piercing Against CMG Operations, Chalak Mitras Group and Mitra Midwest Operations..............................................................................34

    B.    Veil Piercing Against Manish Patel, Pushpak Patel and Mitra Hedgehog..................35

    C.    Laches Does Not Bar Veil Piercing Liability................................................................38

    III.  Defendants are Not Entitled to Summary Judgment on Plaintiffs' Claim for Tortious Interference........................................................................41

    IV.  Defendants are Not Entitled to Summary Judgment on Plaintiffs' Claim for Civil Conspiracy.................................................................................42

Conclusion .............................................................................................................................43

# Table of Authorities

## Cases

*Cunningham v. Pettigrew*, 169 F. 335, 341 (8th Cir. 1909) ................................................................. 39

*Dean v. Noble,* 477 S.W.3d 197, 206 (Mo. Ct. App. 2015) ............................................................ 42

*Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 529 (Mo. Ct. App. 2008) ............................ 33

*Littlefield v. Edmonds*, 172 S.W.3d 903, 908 (Mo. Ct. App. 2005) ................................................ 38

*Martin v. Holloran*,
   No. 4:05CV1857 AGF, 2009 US Dist. LEXIS 148095, *5 (E.D. Mo. Mar. 24, 2009) .............. 31

*Metro. St. Louis Sewer Dist. v. Zykan*, 495 S.W.2d 643, 656-57 (Mo. 1973) .................................. 40

*Mobius Mgmt. Sys., Inc. v. W. Physicians Search, LLC*,
   175 S.W.3d 186 (Mo. Ct. App. 2005) ........................................................................................ 37

*Real Estate Investors Four, Inc. v. Am. Design Grp., Inc.*,
   46 S.W.3d 51 (Mo. Ct. App. 2001) ..................................................................................... 35, 37

*Sandobal v. Armour & Co.*, 429 F.2d 249, 257 (8th Cir. 1970) .................................................. 38, 41

*SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*,
   137 S. Ct. 954, 961 (2017) ......................................................................................................... 38

*State ex rel. Family Support Div. v. Steak'm Take'm, LLC*,
   524 S.W.3d 584 (Mo. Ct. App. 2017) ........................................................................................ 37

*State ex rel. Gen. Elec. Co. v. Gaertner*, 666 S.W.2d 764, 767 (Mo. 1984) ...................................... 41

*Star Dev. Corp. v. Urgent Care Assocs.*, 429 S.W.3d 487, 495 (Mo. Ct. App. 2014) ................. 39-40

*Transamerica Ins. Co. v. Penn. Nat'l Ins. Co.*, 908 S.W.2d 173, 175 n.4 (Mo. Ct. App. 1995) ........ 31

*Vogel v. A.G. Edwards & Sons, Inc.*, 801 S.W.2d 746, 755 (Mo. Ct. App. 1990) ............................. 41

*WEA Crestwood Plaza, LLC v. Flamers Charburgers, Inc.*,
   24 S.W.3d 1, 7 (Mo. Ct. App. 2000) ......................................................................................... 40

**Statutes and Rules**

Mo. Rev. Stat. § 516.110(1) ...............................................................................................39


**Other Authorities**

34 Robert H. Dierker & Richard J. Mehan,
  *Missouri Practice Series: Personal Injury and Torts Handbook*, § 16.5 (2020) ...............................43

<u>**Responses to Defendants' Statement of Facts**</u>

1.      In October 2010, Table Rock Restaurants, LLC ("Table Rock") was purportedly the tenant under three commercial leases: (1) a commercial lease agreement (the "Camdenton Lease") related to real property at 298 East U.S. Highway 54, Camdenton, Missouri (the "Camdenton Property"); (2) a commercial lease agreement (the "Neosho Lease") related to real property at 3075 Gardner Edgewood, Neosho, Missouri (the "Neosho Property"); and (3) a commercial lease agreement (the "Mt. Vernon Lease") related to real property at 1101 East Mt. Vernon Boulevard, Mt. Vernon, Missouri (the "Mt. Vernon Property"). (Exh. 1, Declaration of Manish Patel ("Manish Decl.") at ¶¶ 4–6, Exhs. 7–9; Exh. 2, Deposition of Plaintiff Tryon P. Sisson ("Tryon P. Depo.") at 35:8–18; Exh. 3, Deposition of Plaintiff Tryon N. Sisson ("Tryon N. Depo.") at 50:24–51:12.)

> **<u>Response</u>: Uncontroverted with the clarification that Table Rock was the *actual* tenant, not the *purported* tenant, as indicated in the leases.**

2.      The Camdenton, Neosho, and Mt. Vernon Leases provide that the Leases can be assigned to a KFC Corporation franchisee or licensee without the consent of the landlord. (Exh. 1, Manish Decl. at ¶¶4–6, Exhs. 7–9 at ¶ 26; Exh. 2, Tryon P. Depo. at 29:8–11, 29:19–30:3, 30:25–31:4; Exh. 3, Tryon N. Depo. at 42:9–19.)

> **<u>Response</u>: Uncontroverted.**

3.      Plaintiffs allege that Tryon P. Sisson and Shanon G. Sisson are landlords under the Camdenton and Neosho Leases. (ECF No. 57 at ¶¶ 18, 21.)

> **<u>Response</u>: Uncontroverted.**

4.      Plaintiffs allege that Tryon N. Sisson and Dolores A. Sisson are landlords under the Mt. Vernon Lease. (*Id.* at ¶ 24.)

> **<u>Response</u>: Uncontroverted.**

5.      Tryon N. Sisson testified that the Mt. Vernon Property is owned by his family trust. (Exh. 3, Tryon N. Depo. at 19:22–20:3.)

> **<u>Response</u>: Uncontroverted.**

6.    Tryon P. Sisson testified that he entered into written lease amendments to the Camdenton and Neosho Leases with Table Rock when it was purportedly a tenant under the Camdenton and Neosho Leases. (Exh. 2, Tryon P. Depo. at 38:24–39:24.)

>    **Response**: **Uncontroverted with the clarification that Table Rock was the _actual_ tenant, not the _purported_ tenant, at the time (_see_ SoF ¶ 1 above) and Tryon P. Sisson did not testify differently.**

7.    In October 2010, Table Rock's franchise agreements with KFC that allowed it to operate the quick service restaurants on the Camdenton, Neosho, and Mt. Vernon Properties had been terminated, and Table Rock was on the verge of being "dissolved and/or enter[ing] into bankruptcy," which left Plaintiffs without a lot of great options. (Exh. 2, Tryon P. Depo. at 51:12–53:4, 59:16–24; Exh. 3, Tryon N. Depo. at 35:8–18; Exh. 1, Manish Decl. at ¶ 7, Exh. 10.)

>    **Response**: **Uncontroverted but immaterial.**

8.    Manish and Pushpak were contacted about purchasing Table Rock's 32 quick service restaurants. (Exh. 4, Deposition of Defendant Manish Patel ("Manish Depo.") at 10:4–8; Exh. 5, Deposition of Defendant Pushpak Patel ("Pushpak Depo.") at 19:7–21.)

>    **Response**: **Uncontroverted but immaterial.**

9.    At that time, Manish and Pushpak owned one KFC franchised restaurant. (Exh. 4, Manish Depo. at 7:5–16.)

>    **Response**: **Uncontroverted.**

10.    In November 2010, Table Rock closed on the APA with Chalak Mitras, whereby Table Rock purportedly assigned its lease and franchise rights in 32 quick service restaurants to either Mitra Hedgehog or CMG Operations. (Exh. 4, Manish Depo. at 26:21–25, 31:23–32:23, 33:7–9; Exh. 5, Pushpak Depo. at 31:9–12.)

>    **Response**: **Uncontroverted with the clarification that the leases and franchise rights were _actually_ assigned, not _purportedly_ assigned, as indicated in the referenced documents.**

11.     Manish and Pushpak are managers of Chalak Mitras, and the owners of Mitra Hedgehog and CMG Operations. (Exh. 4, Manish Depo. at 36:18–37:7; Exh. 5, Pushpak Depo. at 31:9–19; 33:15–19.)

**Response:  Uncontroverted.**

12.     The franchise rights and leases associated with the quick service restaurants on the Camdenton, Neosho, and Mt. Vernon Properties were purportedly assigned to Mitra Hedgehog. (Exh. 1, Manish Decl. at ¶¶ 8–11, Exhs. 11–14.)

> **Response:  Uncontroverted with the clarification that the leases and franchise rights were *actually* assigned, not *purportedly* assigned, as indicated in the referenced documents.**

13.     After the APA closed in November 2010, the parties negotiated purported amendments to the Camdenton, Neosho, and Mt. Vernon Leases between Mitra Hedgehog and Plaintiffs, which were effective January 1, 2011. (Exh. 2, Tryon P. Depo. at 62:1–6; Exh. 3, Tryon N. Depo. at 56:11–22; Exh. 1, Manish Decl. at ¶¶ 12–14, Exh. 15–17.)

> **Response:  Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

14.     On March 9, 2011, the Camdenton Lease was purportedly assigned from Mitra Hedgehog to Mitra Camdenton, an approved KFC franchisee. (Exh 4, Manish Depo. at 59:11–60:1; Exh. 1, Manish Decl. at ¶ 15, Exh. 18 at Sisson 0099–0101.)

> **Response:  Uncontroverted with the clarification that the lease was *actually* assigned, not *purportedly* assigned, as indicated in the referenced document.**

15.     On March 9, 2011, the Neosho Lease was purportedly assigned from Mitra Hedgehog to Mitra Neosho, an approved KFC franchisee. (Exh 4, Manish Depo. at 59:11–60:1; Exh. 1, Manish Decl. at ¶ 15, Exh. 18 at Sisson 0105–07.)

> **Response:  Uncontroverted with the clarification that the lease was *actually* assigned, not *purportedly* assigned, as indicated in the referenced document.**

16.     On March 9, 2011, the Mt. Vernon Lease was purportedly assigned from Mitra Hedgehog to Mitra Mt Vernon, an approved KFC franchisee. (Exh 4, Manish Depo. at 59:11–60:1; Exh. 1, Manish Decl. at ¶ 15, Exh.18 at Sisson 0102–04.)

> **Response:**  **Uncontroverted with the clarification that the lease was *actually* assigned, not *purportedly* assigned, as indicated in the referenced document.**

17.     On or before March 24, 2011, Plaintiffs were aware that the Camdenton, Neosho, and Mt. Vernon Leases had been purportedly assigned from Mitra Hedgehog to Mitra Camdenton, Mitra Neosho, and Mitra Mt Vernon. (Exh. 1, Manish Decl. at ¶ 15, Exh. 18 at Sisson 0098; Exh. 2, Tryon P. Depo. at 63:7–11, 65:11–15.)

> **Response:**  **Uncontroverted.**

18.     On March 24, 2011, via email, Manish told Plaintiffs that the current rent structure was unsustainable and he was losing an average of $20,000 per period over the last three periods at the Camdenton, Neosho, and Mt. Vernon restaurants. (Exh. 1, Manish Decl. at ¶ 16, Exh. 19.) Manish further proposed a new rental rate for the three restaurants and told Plaintiffs that the restaurants would have to be closed if they could not come to an agreement on a new rate. (*Id.*; Exh. 3, Tryon N. Depo. at 63:5–19; Exh. 2, Tryon P. Depo. at 65:16–66:12.)

> **Response:**  **Uncontroverted.**

19.     The April 2011 rents due to Plaintiffs under the purported first lease amendments to the Camdenton, Neosho, and Mt. Vernon Leases were partially paid on March 24, 2011. (Exh. 1, Manish Decl. at ¶ 17, Exh. 20 at Sisson 0127–28.)

> **Response:**  **Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

20.     On May 6, 2011, the May 2011 rent due under the purported first lease amendment to the Neosho Lease was partially paid to Plaintiffs; however, the May 2011 rent payments due under the purported first lease amendments to the Camdenton and Mt. Vernon Leases were not paid. (*Id.*)

> **Response:**  **Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

21.     On May 11, 2011, Manish followed-up with Plaintiffs regarding rent reductions and again attempted to negotiate the rent amount due and reiterated that the stores could be turned over to Plaintiffs if they could not reach an agreement. (Exh. 1, Manish Decl. at ¶ 18, Exh. 21; Exh. 3, Tryon N. Depo. at 65:12–66:1; Exh. 2, Tryon P. Depo. at 66:23–67:16.)

> **Response:**  **Uncontroverted.**

22.     In a letter from Plaintiffs' attorney dated May 16, 2011, Plaintiffs sent a formal Cancellation of Rent Reduction and Notice of Non-Payment of Rent, dated May 12, 2011, to Mitra Hedgehog, Mitra Camdenton, Mitra Neosho, and Mitra Mt Vernon because "full payment of the April 2011 rent was not received by the landlords under any of the Leases." (Exh. 1, Manish Decl. at ¶ 17, Exh. 20 at Sisson 0127–28; Exh. 2, Tryon P. Depo. at 67:24–68:20.) Plaintiffs sent the formal Cancellation of Rent Reduction and Notice of Non-Payment of Rent less than two weeks after not receiving the May 2011 rent. (Exh. 3, Tryon N. Depo at 71:12–15.) Plaintiffs' attorney also put Manish on notice that Plaintiffs were uncertain whether the assignments from Mitra Hedgehog to Mitra Camdenton, Mitra Neosho, and Mitra Mt Vernon were valid because Plaintiffs believed those companies (Mitra Camdenton, Mitra Neosho, and Mitra Mt Vernon) had no assets. (Exh. 1, Manish Decl. at ¶ 17, Exh. 20 at Sisson 0126; Exh. 3, Tryon N. Depo. at 68:15–69:10; Exh. 2, Tryon P. Depo. at 63:24–64:3.)

> **Response:**  **Uncontroverted.**

23. Pursuant to the cancellation, the purported January 2011 lease amendments were cancelled and rent amount due reverted back to the original amounts set forth in the Camdenton, Neosho, and Mt. Vernon Leases. (Exh. 1, Manish Decl. at ¶ 17, Exh. 20 at Sisson 0127–28.)

> **Response:** **Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

24. On June 21, 2011, Plaintiffs' attorney sent Manish, as an agent for Mitra Hedgehog, Mitra Camdenton, Mitra Neosho, and Mitra Mt Vernon, and their attorney a letter wherein he informed Manish that although Plaintiffs "instructed [him] to proceed with the filing of lawsuits in Missouri under the Leases to enforce their rights", he "convinced [Plaintiffs] to give [Manish] one last chance to do the right thing." (Exh. 1, Manish Decl. at ¶ 19, Exh. 22.)

> **Response:** **Uncontroverted.**

25. In the letter, Plaintiffs' attorney states that, at that time, Plaintiffs believed Manish "inappropriately implemented the plan of assignment of the [Camdenton, Neosho, and Mt. Vernon] Leases to shell companies to avoid liability under the Leases", that "[t]his tactic will not be accepted", and that Plaintiffs "intend to pursue [their] full legal rights if the terms of the Leases are not satisfied." (*Id.*)

> **Response:** **Uncontroverted.**

26. On June 28, 2011, as the negotiations continued, in response to Plaintiffs' request for the financials of the tenants in the Camdenton, Neosho, and Mt. Vernon Properties, the Mitra Defendants' attorney stated that the tenants' financials "will be closely tied to the performance of the restaurants they lease as the tenants have no other assets. We are happy to represent and warrant those facts to you." (Exh. 1, Manish Decl. at ¶ 20, Exh. 23 at Sisson 0144–45.) The Mitra Defendants' attorney continued:

> We thought we had made clear that the tenants did not have any significant assets apart from the restaurants and the restaurants would need to stand alone or it would be difficult to pay the rent. If that was not clear, we are sorry. . . . The stores are not producing as they once were and absent rent concessions, they do not make much sense. I think we have been clear about that.

. . . . We understand your client's need for a reasonable return on their investment and it is our hope that the restaurants will recover in the future sufficient to provide that return. In the interim, we have asked if your client would prefer to have the restaurants back and empty or would want to pursue negotiations to arrive at a rent we both can live with for some period of time. That is up to your client, we are not trying to dictate what he should do.

(*Id.*)

**Response: Uncontroverted.**

27.　After the Mitra Defendants' attorney's email to Plaintiffs' attorney, Plaintiffs continued with the rent modification negotiations. (*Id.* at Sisson 0144.)

**Response: Uncontroverted.**

28.　On July 27, 2011, in a letter to Manish, as an agent for Mitra Hedgehog, Mitra Camdenton, Mitra Neosho, and Mitra Mt Vernon, Plaintiffs proposed:

(a) [the Mitra Defendants] bring all [back] rent current . . ., (b) the parties agree to temporarily reduce the rent to $5,250 at each of [Plaintiffs'] three (3) store locations for one (1) year beginning with the August 2011 rent and (c) Mitra Hedgehog, LLC shall sign a guaranty of all obligations under the three (3) leases.

(*Id.* at Sisson 0148.) Plaintiffs continued that "[t]he one year period will allow us to have approximately eighteen months of operational figures at the locations for us to analyze and consider whether additional rent modifications are appropriate." (*Id.*)

**Response: Uncontroverted.**

29.　On August 1, 2011, Manish responded by stating Plaintiffs' rent offer of $5,250 was too high, and counteroffered that rent would be $4,000 for the Camdenton Property, $4,350 for the Neosho Property, and $4,100 for the Mt. Vernon Property. (Exh. 1, Manish Decl. at ¶ 21, Exh. 24 at Sisson 0150.) Further, Manish stated the guaranty would come from Mitra Camdenton, Mitra Neosho, and Mitra Mt. Vernon, not Mitra Hedgehog. (*Id.*)

**Response: Uncontroverted.**

30. On August 5, 2011, Plaintiffs sent an offer to Manish, as the agent for Mitra Hedgehog, Mitra Camdenton, Mitra Mt Vernon, and Mitra Neosho, proposing that (1) all back rent would be paid in full in accordance with the rental figures of the original leases; (2) from August 2011 through July 31, 2012, the monthly rent would be $4,875 for each location; and (3) prior to August 1, 2012, the parties would renew discussions and analyze the actual gross revenues from the preceding year so "[t]he parties will agree upon whether further adjustments to the rental amounts are justified." (*Id.* at Sisson 0157.)

> **Response:** **Uncontroverted with the clarification that Defendants did not return with financials during the term of the second lease amendment to discuss or propose any further rent modifications. (Tryon P. Sisson Depo., attached as Exhibit M, at 107:11-108:6.)**

31. On August 8, 2011, Manish accepted Plaintiffs' rent offer of $4,875 for each Property, and the parties further negotiated the amount of back rent due. (Exh. 1, Manish Decl. at ¶ 22, Exh. 25 at Sisson 0171.)

> **Response:** **Uncontroverted.**

32. Plaintiffs again brought up Mitra Hedgehog's guaranty and requested that Mitra Hedgehog be added as a guarantor to the lease amendments for one year because they felt Mitra Camdenton, Mitra Neosho, and Mitra Mt Vernon were "insolvent when it came down to any obligations to pay any money." (*Id.*; Exh. 3, Tryon N. Depo. at 86:21–87:1, 88:13–16, 90:5–9; 91:9–22.)

> **Response:** **Uncontroverted.**

33. The purported Second Amendment to the Camdenton Lease became effective on August 1, 2011 and is between Plaintiffs and Mitra Camdenton. (Exh. 1, Manish Decl. at ¶ 23, Exh. 26.)

> **Response:** **Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

34.     The purported Second Amendment to the Mt. Vernon Lease became effective on August 1, 2011 and is between Plaintiffs and Mitra Mt Vernon. (Exh. 1, Manish Decl. at ¶ 24, Exh. 27.)

>   **Response:**  **Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

35.     The purported Second Amendment to the Neosho Lease became effective on August 1, 2011 and is between Plaintiffs and Mitra Mt Neosho. (Exh. 1, Manish Decl. at ¶ 25, Exh. 28.)

>   **Response:**  **Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

36.     Each purported amendment provides for the modification of rent for a one year term—from August 1, 2011 through July 31, 2012. (Exh. 1, Manish Decl. at ¶¶ 23–25, Exh. 26–28.) Under the purported second lease amendments, the rent for the Camdenton, Neosho, and Mt. Vernon Properties was $4,875 per month per property. (*Id.*) Further, the purported amendments incorporate the terms of the original Leases and provide that the rent due under the Camdenton, Neosho, and Mt. Vernon Leases would be reinstated after August 1, 2012. (*Id.*) Last, Mitra Hedgehog guaranteed to Plaintiffs the full payment of rent for the term of the purported second lease amendments. (*Id.*)

>   **Response:**  **Uncontroverted with the clarification that the parties negotiated and executed *actual* amendments, not *purported* amendments, as indicated in the referenced documents.**

37.     On April 26, 2013, as part of refinancing a loan, the Neosho Lease was purportedly assigned from Mitra Neosho to Mitra Midwest Operations, an approved KFC franchisee. (Exh. 4, Manish Depo. at 63:6–9; Exh. 1, Manish Decl. at ¶¶ 26–27, Exhs. 29–30.)

>   **Response:**  **Uncontroverted with the clarification that the lease was *actually* assigned, not *purportedly* assigned, as indicated in the referenced document.**

38.     Similarly, on April 26, 2013, as part of refinancing a loan, the Mt. Vernon Lease was purportedly assigned from Mitra Mt Vernon to Mitra Midwest. (Exh. 4, Manish Depo. at 63:6–9; Exh. 1, Manish Decl. at ¶ 28–29, Exhs. 31–32.)

**Response:** **Uncontroverted with the clarification that the lease was *actually* assigned, not *purportedly* assigned, as indicated in the referenced document.**

39.     In 2013, approximately eighteen to twenty restaurants were assigned to Mitra Midwest. (Exh. 4, Manish Depo. at 71:8–12; Exh. 5, Pushpak Depo. at 100:25–101:3.) Currently, Mitra Midwest operates approximately fifty restaurants. (Exh. 4, Manish Depo. at 71:16–24; Exh. 5, Pushpak Depo. at 100:15–24.)

**Response:  Uncontroverted.**

40.     Manish and Pushpak are the managers of Mitra Midwest. (Exh. 4, Manish Depo. at 51:21–52:5.)

**Response:  Uncontroverted.**

41.     Following the purported assignments of the Neosho and Mt. Vernon Leases to Mitra Midwest, and starting with the rent payments due for June 2013 (paid May 23, 2013), Mitra Midwest has paid all operating expenses at the Mt. Vernon and Neosho Properties, including rent payments. (Exh. 1, Manish Decl. at ¶ 30, Exh. 33.)

**Response:  Uncontroverted.**

42.     Mitra Midwest has been capitalized since its formation. (Exh. 4, Manish Depo. at 71:8–12; Exh. 5, Pushpak Depo. at 100:25–101:3; Exh. 1, Manish Decl. at ¶ 31, Exh. 34.) Further, since its creation, Mitra Midwest has had its own financial statements that capture the profit and losses, as well as the assets and liabilities, associated with the stores assigned to it. (Exh. 1, Manish Decl. at ¶¶ 32–33, Exh. 35–36.)

**Response:  Controverted. After the Neosho Lease and Mt. Vernon Lease were assigned to Mitra Midwest in April 2013, the rent under both leases for the month of May continued to be paid by Mitra Hedgehog, not Mitra Midwest. (*See* SoF ¶ 106 below, citing Second TPS Decl., Ex. A, ¶ 22.)**

43.     The Camdenton Lease was not assigned to Mitra Midwest because the bank did not want it as collateral to the loan, as that restaurant was underperforming so badly that it would detract from the portfolio of collateral. (Exh. 4, Manish Depo. at 74:4–18; Exh. 5, Pushpak Depo. at 91:24–92:8.)

> **Response:**  **Uncontroverted that the Patels testified to this, but Defendants have not produced any documents substantiating the assertion.**

44.     All the restaurants that were assigned to CMG Operations in November 2010 that were still open in April 2013 were assigned to Mitra Midwest. (Exh. 4, Manish Depo. at 73:23–74:4.) And, all the restaurants originally assigned to Mitra Hedgehog that were still open in April 2013, besides Camdenton's, were assigned to Mitra Midwest. (Exh. 4, Manish Depo. at 74:3–11.)

> **Response:**  **Uncontroverted.**

45.     From August 2011 through May 2017, Plaintiffs did not contact an employee of the Mitra Entities or Manish or Pushpak regarding the modified rent payments. (Exh. 2, Tryon P. Depo. at 80:10–15, 82:22–83:7; Exh. 4 Manish Depo. at 170:3–7.)

> **Response:**  **Controverted. Tryon P. Sisson testified that he communicated the default status of the leases to a representative of the Defendants working on landlord consent and estoppel forms for Defendants refinance with Well Fargo in 2013. (Tryon P. Sisson Depo., Ex. M, at 80:16-81:12; *see also* SoF ¶¶ 100-102 below)**

46.     From August 2012 until May 2017, the Mitra Defendants continued to pay $4,875 for each Property, as they believed that was the rent amount due and had not heard otherwise from Plaintiffs. (Exh. 4, Manish Depo. at 170:11–16; Exh. 5, Pushpak Depo. at 13:9–23.)

> **Response:**  **Uncontroverted that Defendants continued to pay this amount of rent, but it is disputed that they could have reasonably believed this was the amount due because they "had not heard otherwise from Plaintiffs." *See* Resp. to SoF No. 45 above. In addition, Defendants have admitted that rent was unpaid under the leases. (*See* Doc. #106 SoF ¶¶ 41-43.)**

47.     In May 2017, Pushpak called Plaintiffs to inform them that, even with the modified rent payment, the restaurant on the Camdenton Property had to close. (Exh. 2, Tryon P. Depo. at 88:8–16.)

**Response:  Uncontroverted.**

48.     Following the phone call, Plaintiffs sent a letter to Pushpak raising for the first time any issue with the amount of rent payments they received. (Exh. 2, Tryon P. Depo. at 88:8–16; Exh. 6, Declaration of Pushpak Patel ("Pushpak Decl.") at ¶ 4, Exh. 37.)

**Response:  Controverted. This was not the first time Plaintiffs had taken issue with the rent payments being made by Defendants. *See* Resp. to SoF No. 45 above.**

49.     In the letter, Plaintiffs requested that Pushpak provide a proposal to resolve the rent issue. (*Id.* at Sisson 0541; Exh. 2, Tryon P. Depo. at 92:14–22.)

**Response:  Uncontroverted.**

50.     Pushpak sent Plaintiffs two proposals in June 2017 to resolve the rent issue. (Exh. 6, Pushpak Decl. at ¶ 5, Exh. 38 at Sisson 0402–03.)

**Response:  Uncontroverted.**

51.     Plaintiffs did not respond to Pushpak's proposals until their attorney sent a letter in September 2017. (*Id.* at Sisson 0402; Exh. 6, Pushpak Decl. at ¶ 5, Exh. 39.)

**Response:  Uncontroverted.**

52.     The September 2017 letter from Plaintiffs' attorney rejected Pushpak's proposals, provided Plaintiffs' offer to resolve the back rent issue, and proposed to modify the terms of the Leases. (Exh. 6, Pushpak Decl. at ¶ 6, Exh. 39.)

**Response:  Uncontroverted.**

53.     On September 25, 2017, the Mitra Defendants' attorney sent a letter to Plaintiffs' attorney providing a counteroffer to resolve the back rent issue and modify the rent terms. (Exh. 6, Pushpak Decl. at ¶ 7, Exh. 40.)

**Response:  Uncontroverted.**

54.     On October 20, 2017, after not receiving a response to his attorney's September 25 offer, and in the hopes of "work[ing] things out as soon as possible", Pushpak contacted Plaintiffs inquiring about a response to their offer. (Exh. 6, Pushpak Decl. at ¶ 8, Exh. 41 at Sisson 0438–39.)

**Response:  Uncontroverted.**

55.     In their response, Plaintiffs commented that they "had some other more urgent pressing matters that [they] have dealt with" and stated that they would have a formal response to the Mitra Defendants' offer soon. (*Id.* at Sisson 0439)

**Response:  Uncontroverted.**

56.     In November 2017, after not having received a response from Plaintiffs, the Mitra Defendants' attorney contacted Plaintiffs' attorney for a response. (Exh. 6, Pushpak Decl. at ¶ 9, Exh. 42.) Plaintiffs' attorney said he would check with Plaintiffs. (*Id.*)

**Response:  Uncontroverted.**

57.     Plaintiffs did not contact an employee of the Mitra Entities or Manish or Pushpak regarding the modified rent payments for the rest of 2017. (Exh. 2, Tryon P. Depo. at 94:5–10.)

**Response:  Uncontroverted but immaterial as Plaintiffs were under no obligation to do so.**

58.     Plaintiffs did not contact an employee of the Mitra Entities or Manish or Pushpak regarding the modified rent payments in 2018. (Exh. 2, Tryon P. Depo. at 95:12–16; Exh. 3, Tryon N. Depo. at 105:21–24.)

**Response:  Uncontroverted but immaterial as Plaintiffs were under no obligation to do so.**

59.     Plaintiffs did not contact an employee of the Mitra Entities or Manish or Pushpak regarding the modified rent payments in 2019. (Exh. 2, Tryon P. Depo. at 95:12–16; Exh. 3, Tryon N. Depo. at 105:25–06:1.)

**Response:  Uncontroverted but immaterial as Plaintiffs were under no obligation to do so.**

60.     In March 2020, after receiving a letter from Pushpak regarding a rent abatement or deferment due to the COVID-19 health crisis, Plaintiffs emailed Pushpak requesting financials so they could determine how to respond to his request. (Exh. 6, Pushpak Decl. at ¶ 10, Exh. 43.)

**Response:  Uncontroverted.**

61.     In their March 2020 email, Plaintiffs acknowledged that the parties' prior negotiations "have been on hold." (*Id.* at Sisson 0485.)

**Response:  Uncontroverted.**

62.     Pushpak responded by stating that the Mitra Defendants would continue to pay rent on the Camdenton, Neosho, and Mt. Vernon Properties. (*Id.* at Sisson 0484.)

**Response:  Uncontroverted.**

63.     In response, Plaintiffs thanked Pushpak for "continu[ing] to pay the rent" on the Properties and stated that they "were preparing to contact [him] to resume [the] negotiations that have been on hold." (*Id.* at Sisson 0483) At that time, continuing to pay rent on the Camdenton, Neosho, and Mt. Vernon Properties would have been continuing to pay the modified rent payments that the Mitra Defendants had been making since 2011. (Exh. 2, Tryon P. Depo. at 97:5–15.)

**Response:  Uncontroverted that Plaintiffs "thanked" Pushpak Patel, but it is denied that this was an acceptance of the reduced rent amount as the full value of rent due and owing each month under the leases. (First TPS Decl., Doc. #106-1, ¶ 31; First TNS Decl., Doc. #106-24, ¶ 17.)**

64.    Plaintiffs did not contact Pushpak, Manish, or an employee of the Mitra Entities regarding the modified rent payments until October 2020, when Pushpak emailed Plaintiffs regarding the filing of this lawsuit. (Exh. 6, Pushpak Decl. at ¶ 11, Exh. 44 at Sisson 0517; Exh. 5, Pushpak Depo. at 152:5–20.)

**Response**:  **Uncontroverted.**

65.    Had Plaintiffs notified an employee of the Mitra Entities or Manish or Pushpak of the modified rent payments issue in 2013, they would have closed the restaurants. (Exh. 5, Pushpak Depo. at 147:3–22.)

**Response**:  **Controverted. Plaintiffs did notify a representative of the Mitra Entities that the modified rent payments were unacceptable and that the leases were in default in 2013, but Defendants did not close any of the stores.** *See* **Resp. to SoF No. 45 above.**

66.    The Camdenton, Neosho, and Mt. Vernon Leases provide:

Mitigation of Damages. Each party agrees that it has a duty to mitigate damages and covenants that it will use commercially reasonable efforts to minimize any damages it may incur as a result of the other party's performance or non-performance of this Agreement.

(Exh. 1, Manish Decl. at ¶¶ 4–6, Exhs. 7–9 at ¶ 17(c).)

**Response**:  **Uncontroverted that the lease provision is accurately quoted, but denied that Plaintiffs breached this provision.**

67.    Plaintiffs testified that they did not contact the Mitra Entities or Manish or Pushpak regarding the modified rent payments issue because they were afraid of the restaurants being shut down. (Exh. 2, Tryon P. Depo. at 84:6–15.)

**Response**:  **Uncontroverted.**

68.    The value of a property is negatively impacted if the restaurant on that property closes. (Exh. 2, Tryon P. Depo. at 66:16–22.)

**Response**:  **Uncontroverted.**

69.     Between September 2017 and immediately prior to the filing of this lawsuit, Push-pak believed the parties would resolve the newly raised issues with the modified rent payments through negotiation. (Exh. 5, Pushpak Depo. at 152:5–20; 177:4–18.)

**Response:  Uncontroverted.**

## Statement of Additional Uncontroverted Material Facts

70.     Plaintiffs Tyron P. Sisson and Shanon G. Sisson are the owners of real property located at 298 East U.S. Highway 54, Camdenton, Missouri 65020 (the "Camdenton Property"), which they purchased in August 2006. (Second Declaration of Tryon P. Sisson ("Second TPS Decl."), attached as **Exhibit A**, ¶ 2.)

71.     They purchased the Camdenton Property from Gardner Properties of Springfield, LLC, which had purchased the property in September 2005 from the prior owners (and the original lessors on the Camdenton Lease) Richard T. Gregg and Jenny D. Gregg. (Second TPS Decl., **Ex. A**, ¶ 3; *see also* Warranty Deed attached as **Exhibit B**.)

72.     In conjunction with the purchase of the Camdenton Property, the Sissons were assigned all rights and interest in, and became the landlord under, a commercial lease originally executed on April 6, 2005 (the "Camdenton Lease") that is already included in the summary judgment record as Doc. #106-2. (Second TPS Decl., **Ex. A**, ¶ 4; Lease Assignment attached as **Exhibit C**.)

73.     Plaintiffs Tyron P. Sisson and Shanon G. Sisson are also the owners of real property located at 3075 Gardner-Edgewood Drive, Neosho, Missouri 64850 (the "Neosho Property), which they purchased in July 2006. (Second TPS Decl., **Ex. A**, ¶ 5.)

74.     They purchased the Neosho Property from Bull Creek Ranch, LLC. (Second TPS Decl., **Ex. A**, ¶ 6; *see also* Warranty Deed attached as **Exhibit D**.)

75.     In conjunction with the purchase of the Neosho Property, the Sissons were assigned all rights and interest in, and became the landlord under, a commercial lease originally executed on April 6, 2005 (the "Neosho Lease") that is already included in the summary judgment record as Doc. #106-8. (Second TPS Decl., **Ex. A**, ¶ 7; *see also* Lease Assignment attached as **Exhibit E**.)

76.     Plaintiffs Tyron N. Sisson and Dolores A. Sisson are the owners of real property located at 1101 East Mt. Vernon Boulevard, Mt. Vernon, Missouri 65712 (the "Mt. Vernon Property"), which they purchased in October 2006. (Second Declaration of Tryon N. Sisson ("Second TNS Decl."), attached as **Exhibit F**, ¶ 2.)

77.     In conjunction with the purchase of the Mt. Vernon Property, the Sissons were assigned all rights and interest in, and became the landlord under, a commercial lease originally executed on April 6, 2005 (the "Mt. Vernon Lease") that is already included in the summary judgment record as Doc. #106-25. (Second TNS Decl., **Ex. F**, ¶ 3.)

78.     The Sissons purchased the Mt. Vernon Property from Bull Creek Ranch, LLC, the original lessor under the Mt. Vernon Lease. (Second TNS Decl., **Ex. F**, ¶ 4; *see also* Warranty Deed, attached as **Exhibit G**.)

79.     Bull Creek Ranch was a company owned and managed by Richard T. Gregg; he signed the original Mt. Vernon Lease and the Warranty Deed for the Sissons purchase of the Mt. Vernon Property from Bull Creek Ranch. . (Second TNS Decl., **Ex. F**, ¶ 5.)

80.     The Sissons purchased the Mt. Vernon Property from Mr. Gregg's company as a like-kind exchange under Section 1031 of the Internal Revenue Code (a "1031 Exchange"), meaning they used proceeds of a different sale of similar property to make the purchase. 1031 Exchanges are strictly controlled and handled through brokers who process and document all the aspects of the transaction and qualified intermediaries who hold and transfer purchase funds during the transaction to ensure legal compliance. In this case, the broker for the transactions was RE/MAX Commercial and the qualified intermediary was Asset Preservation, Inc. (Second TNS Decl., **Ex. F**, ¶ 6.)

81.     The Sissons purchase of the Mt. Vernon Property was handled in the same way by the same broker as earlier purchases by Tryon P. Sisson and Shanon G. Sisson of the Camdenton Property and Neosho Property, which were located in the same area and occurred during the same time period. Like the Mt. Vernon Property, the Camdenton Property and Neosho Property were purchased as 1031 Exchanges using RE/MAX Commercial as the broker and Asset Preservation, Inc. as the qualified intermediary to handle processing, documentation, and funding of the transactions. (Second TNS Decl., **Ex. F**, ¶ 7; *see also* Second TPS Decl., **Ex. A**, ¶ 8.)

82.     For the Sissons purchase of the Mt. Vernon Property, the parties were required to execute numerous documents, including a purchase agreement, the warranty deed identified above and an assignment of the Mt. Vernon Lease from Bull Creek Ranch to Tryon N. Sisson and Dolores A. Sisson as the new lessors of the property. (Second TNS Decl., **Ex. F**, ¶ 8.)

83.     The Sissons cannot locate a copy of their assignment of the Mt. Vernon Lease from Bull Creek Ranch, LLC. But this assignment was in substantially the same form as the Lease Assignments for the Camdenton Lease and Neosho Lease attached as **Exhibit C** and **Exhibit E**, respectively, to the Suggestions in Opposition. (Second TNS Decl., **Ex. F**, ¶ 9.)

84.     All three lease assignments are virtually identical except for the date, identification of the "assignor" and the property address. Compared to the assignments of the Camdenton Lease and Neosho Lease, the only differences for the assignment of the Mt. Vernon Lease would be the date (October 10, 2006) and the property address. The "assignor" for the Mt. Vernon lease assignment would also have been different from the assignment of the Camdenton Lease (which had different owner/lessor at the time of purchase), but would have been identical to the "assignor"

in the assignment of the Neosho Lease because both the Neosho Property and Mt. Vernon Property were purchased from Richard T. Gregg's company Bull Creek Ranch, LLC. (Second TNS Decl., **Ex. F**, ¶ 9; *see also* Second TPS Decl., **Ex. A**, ¶ 6.)

85.     Like the Neosho Lease Assignment (**Ex. E**), the lease assignment of the Mt. Vernon Property would have been signed by Richard T. Gregg. (Second TNS Decl., **Ex. F**, ¶ 9.)

86.     The substance of the transactional documents (including the lease assignments) was essentially the same for the Camdenton Property, Neosho Property and Mt. Vernon Property, all of which were purchased as 1031 Exchanges using the same third parties as the broker and the qualified intermediary and using their standard forms to complete the transactions. (Second TNS Decl., **Ex. F**, ¶ 9; *see also* Second TPS Decl., **Ex. A**, ¶ 8.)

87.     Since Plaintiffs purchased the three properties at issue in this case, all tenants on the properties have recognized them as the landlord and lessor by assignment under the respective leases for the properties. At the outset, Plaintiffs received rent payments from Ozark Restaurants, LLC. When Ozark Restaurants sold its restaurants to Table Rock Restaurants, LLC in 2007, Plaintiffs I received notices of the transfers as the landlords of the properties. After this transaction, Plaintiffs received rent payments from Table Rock Restaurants as the landlords of the properties. (Second TPS Decl., **Ex. A**, ¶ 9; Second TNS Decl., **Ex. F**, ¶ 10; *see also* Landlord Notification Letters, attached as **Exhibit H**.)

88.     Defendants procured the leases and franchise rights to operate the restaurants on the three properties at issue in this case in an Asset Purchase Agreement with Table Rock Restaurants. The Asset Purchase Agreement for that transaction identifies Plaintiffs as the landlords of those properties. (Second TPS Decl., **Ex. A**, ¶ 10; Second TNS Decl., **Ex. F**, ¶ 11; *see also* Excerpts of Asset Purchase Agreement, attached as **Exhibit I**, at Sched. 1.01(b).)

89.     In conjunction with the Asset Purchase Agreement, the parties executed an Assignment and Assumption of Lease for each property at issue in this case that recognized Mitra Hedgehog as the "assignee" assuming the tenancy and obligations under the leases for the properties and recognized Plaintiffs as the "landlords" under those leases. These documents were signed by Manish Patel and "manager" of Mitra Hedgehog and by Plaintiffs as "landlords" of their respective properties. (Second TPS Decl., **Ex. A**, ¶ 11; Second TNS Decl., **Ex. F**, ¶ 12; *see also* Assignment and Assumption of Leases, Doc. #106-3, 106-9, 106-26.)

90.     When the parties executed respective amendments of each lease for the three properties at issue in this case in January 2011, they recited in the amendments that Plaintiffs were the "landlords" under those leases and that together with Mitra Hedgehog, they "constitute all of the current Parties" to those leases. Plaintiffs signed the amendments as "landlords" and Manish Patel signed the amendments as the "manager" of Mitra Hedgehog. (Second TPS Decl., **Ex. A**, ¶ 12; Second TNS Decl., **Ex. F**, ¶ 13; *see also* Amendments of Lease, Doc. #106-4, 106-10, 106-27.)

91.     When each of the leases at issue in this case was assigned from Mitra Hedgehog to stand-alone shell companies (Mitra Camdenton, LLC; Mitra Neosho, LLC; and Mitra Mt Vernon, LLC) in March 2011, Manish Patel sent Tryon N. Sisson copies of the lease assignments by email. The assignments were dated March 9, 2011, but the email notifying Plaintiffs of the assignments was not sent until March 22, 2011. Plaintiffs had not been previously advised that the leases would be assigned. (Second TNS Decl., **Ex. F**, ¶ 14; Second TPS Decl., **Ex. A**, ¶ 13; *see also* Manish Patel email attaching lease assignments, attached as **Exhibit J**.)

92.     The assignments of the leases for the three properties to Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon, respectively, were made without landlord consent under the provi-

sion in Section 26 of the leases providing that "Tenant may assign this Lease . . . to a KFC Corporation franchisee or licensee (an "Approved Franchisee"), without the consent of the Landlord." Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon were approved KFC franchisees that had received the rights to operate the restaurants on the respective properties through an Assignment of Franchise from Mitra Hedgehog that was signed for both entities by Manish Patel and witnessed for both entities by Pushpak Patel. (Second TPS Decl., **Ex. A**, ¶ 14; Second TNS Decl., **Ex. F**, ¶ 15; *see also* Assignments of Franchise, Doc. #106-6, 106-12, 106-29.)

93. Defendants never sought or obtained landlord consent for the assignment of the leases for the properties at issue in this case to Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon; they simply executed those assignments and gave notice to Plaintiffs almost two weeks after the fact. Plaintiffs had no ability to prevent the assignments even though Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon were uncapitalized shell companies with no assets. (Second TPS Decl., **Ex. A**, ¶ 15; Second TNS Decl., **Ex. F**, ¶ 16.)

94. When the parties executed second amendments of the leases for the properties at issue in this case in August 2011, they again confirmed that Plaintiffs were the "landlords" under those leases. Plaintiffs signed the second amendments as "landlords" and Manish Patel signed the second amendments as the manager of "tenants" Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon. (Second TPS Decl., **Ex. A**, ¶ 16; Second TNS Decl., **Ex. F**, ¶ 17; *see also* Second Amendments to Lease, Doc. #106-7, 106-13, 106-30.)

95. Plaintiffs would have preferred not to deal with Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon, but they had no choice in the matter because those entities were named tenants under the leases for the subject properties by virtue of the lease assignments from Mitra

Hedgehog that were made without Plaintiffs' consent. (Second TPS Decl., **Ex. A**, ¶ 17; Second TNS Decl., **Ex. F**, ¶ 18.)

96.     Since Defendants took over operation of the restaurants on the properties at issue in this case in November 2010, they have treated Plaintiffs as the lessor and landlord under the leases for those properties. At all times since, monthly rent payments have been made by checks payable to Plaintiffs from either Mitra Hedgehog, LLC or Mitra Midwest Operations, LLC, and at all times since, representatives of the Mitra entities (including Defendant Manish Patel and Push-pak Patel) have recognized Plaintiffs in communications as the landlords on the leases. (Second TPS Decl., **Ex. A**, ¶ 18; Second TNS Decl., **Ex. F**, ¶ 19; *see, e.g.*, email attached as **Exhibit K**.)

97.     Since Defendants took over operation of the restaurants on the properties at issue in this case in November 2010, there has not been any dispute, disagreement, confusion or lack of clarity on the fact that Plaintiffs are the lessors and landlords under the leases for those properties. (Second TPS Decl., **Ex. A**, ¶ 19; Second TNS Decl., **Ex. F**, ¶ 20.)

98.     Since Defendants took over operation of the restaurants on the properties at issue in this case in November 2010, there has been no competing claim by any other individual or entity purporting to be a lessor or landlord under any of the leases for those properties. The parties in this case have operated for 11 years under the correct and accurate impression that Plaintiffs are the lessors and landlords on those leases. (Second TPS Decl., **Ex. A**, ¶ 20; Second TNS Decl., **Ex. F**, ¶ 21.)

99.     Since Defendants took over operation of the restaurants on the properties at issue in this case in November 2010, Manish Patel and Pushpak Patel have never raised any question or objection to the fact that Plaintiffs are lessors and landlords under the leases for those properties. Before Defendants filed their motion for summary judgment describing the "purported" parties

to the leases and other related agreements, Plaintiffs had no idea this was an issue. There is nothing "purported" about the true parties to the lease or their respective obligations under the lease, and the conduct of Manish Patel and Pushpak Patel demonstrates this. (Second TPS Decl., **Ex. A**, ¶ 21; Second TNS Decl., **Ex. F**, ¶ 22.)

100.　　In early 2013, Manish Patel was working with Metropolitan Capital Advisors to re-finance the loan on stores that would be operated by Mitra Midwest Operations, including the restaurants on the Neosho Property and Mt. Vernon Property owned by Plaintiffs. Manish Patel authorized Jessica Rodriguez with Metropolitan Capital Advisors to work on behalf of the Mitra entities to obtain Landlord Consent and Estoppel forms in conjunction with this refinancing. (First TPS Decl., Doc. #106-1, ¶ 21; *see also* emails previously entered in record as Doc. #106-16.)

101.　　After reviewing the proposed Landlord Consent and Estoppel forms provided by Ms. Rodriguez, Tryon P. Sisson emailed Ms. Rodriguez advising that Plaintiffs could not sign those forms because they incorrectly represented that rent was paid in full on the leases for the Neosho and Mt. Vernon restaurants. Mr. Sisson specifically advised Ms. Rodriguez that the temporary rent reductions on the leases for the properties expired, and that rent had returned to the full amount effective August 1, 2012. He advised her that $36,625.85 was due and owing in unpaid rent on the Neosho Lease and that $28,876.59 was due and owing in un-paid rent on the Mt. Vernon Lease. (First TPS Decl., Doc. #106-1, ¶ 22; *see also* email previously entered in record as Doc. #106-17.)

102.　　Ms. Rodriguez forwarded Mr. Sisson's email regarding unpaid rent to Manish Patel, asking him to "please read the email below and advise." (First TPS Decl., Doc. #106-1, ¶23; *see also* email previously entered in record as Doc. #106-18; Pushpak Patel Depo., Doc. #106-33, at 132:20-133:16.)

103.     In further email correspondence with Ms. Rodriguez, Manish Patel admitted that the leases with Plaintiffs were moved to "individual entities" (i.e., Mitra Camdenton, Mitra Neosho and Mitra Mt. Vernon) in order to get "the landlord to reduce his rent." Manish Patel described Tyron P. Sisson "as the most pain in the ass to deal with." (Emails, **Ex. K**.)

104.     In the same email, Manish Patel also acknowledged his understanding that the rent modification in the second lease amendments had "expired in August, 2012." (Emails, **Ex. K**.)

105.     When the refinancing agreement with Wells Fargo was completed, it included representations from Manish Patel and Pushpak Patel that Plaintiffs were the landlords by assignment on the Neosho and Mt. Vernon Leases. The Wells Fargo Credit Agreement is marked "confidential," so a redacted copy and excerpted copy is provided as **Exhibit L**. Schedule 5.08(b) identifies Plaintiffs as landlords and Section 5.08(b) includes the Patels representation that this Schedule is true and accurate.

106.     When Mitra Midwest Operations was assigned the Neosho Lease and Mt. Vernon Lease, it did not immediately make rent payments on those leases. Instead, the rent payment for the month of May 2013 on both leases came from Mitra Hedgehog. (Second TPS Decl., **Ex. A**, ¶ 22.)

107.     Negotiations with Defendants on the leases stopped in 2017 in part because Tryon P. Sisson was dealing with health issues with his father Tyron N. Sisson. He was also hesitant to push too hard on the issue of rent for fear that Defendants would close the Camdenton restaurant while he still had a mortgage on that property. That changed in 2020 when the mortgage was paid off and the leverage Defendants had with the shell company as the named tenant on the Camdenton Lease was somewhat neutralized. (Second TPS Decl., **Ex. A**, ¶ 23.)

108.    Manish Patel admitted in his deposition that avoiding lease liability was one reason why the leases for the Camdenton, Neosho and Mt. Vernon restaurants were assigned to Mitra Camdenton, Mitra Neosho and Mitra Mt. Vernon (what he referred to as "single-purpose entities"). Avoiding vendor liability was another reason. (Manish Patel Depo., Doc. #106-32, at 43:21-44:16, 45:9-13, 46:13-47:10, 52:11-53:11.)

109.    In December 2012, Manish Patel sent an email to Sunny Sajnani of Metropolitan Capital Advisors in connection with refinancing of the bank loan on the restaurant portfolio stating that the single-purpose entities (including Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon) did not have employer identification numbers and "were just scare tactics for landlords." (Emails, Doc. #106-40, at MITRA 010963; *see also* Manish Patel Depo., Doc. #106-32, at 134:14-136:16, 140:12-141:1.)

110.    Manish Patel explained in his deposition that Mitra Camdenton, Mitra Neosho and Mitra Mt Vernon did not have any functional existence and were used to scare Plaintiffs into giving rent concessions on the leases for the properties because Plaintiffs were "not really working with" Manish Patel and Pushpak Patel on the issue of rent. (Manish Patel Depo., Doc. #106-32, at 141:2-142:19, 144:1-8.)

## Introduction

Defendants' Motion for Summary Judgment fails because they have not demonstrated an entitlement to judgment as a matter of law on the factual record in this case. Except when conceded in Sections II.A and III below, the Court should reject all of Defendants' arguments and deny the motion in its entirety.

## Argument and Authorities

Federal Rule of Civil Procedure 56(a) provides that a party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Defendants have not met this standard and their motion for summary judgment should be denied in its entirety.

## I. Plaintiffs have Standing to Sure for Breach of the Leases

In a conclusory, one-paragraph argument, Defendants assert that Plaintiffs lack standing to sue as landlords under the leases because they "have not produced any evidence showing they were in fact assigned the Leases." (Doc. #102 at 15.) For the Camdenton Lease and Neosho Lease, this is patently false. Plaintiffs have produced copies of both the warranty deeds (Exs. B and D) for the purchase of these properties and the lease assignments (Exs. C and E) demonstrating they are the rightful landlords under the leases the properties. (SoF ¶¶ 70-75.) Defendant's standing argument with respect to the Camdenton Lease and Neosho Lease should be rejected.

On the Mt. Vernon Lease, Tryon N. Sisson lost his copy of the lease assignment but can prove the existence and terms of that document with clear, convincing, and undisputed evidence as permitted by Missouri law. *See, e.g., Transamerica Ins. Co. v. Penn. Nat'l Ins. Co.*, 908 S.W.2d 173, 175 n.4 (Mo. Ct. App. 1995) (recognizing use a "clear and convincing standard" to prove lost written instruments); *Martin v. Holloran*, No. 4:05CV1857 AGF, 2009 US Dist. LEXIS 148095, *5

(E.D. Mo. Mar. 24, 2009) ("Missouri, like other jurisdictions, generally permits a lost document to be proved by secondary evidence."). Mr. Sisson declares that he and his wife became the landlords under the Mt. Vernon Lease when they purchased the Mt. Vernon Property from the original lessor, Bull Creek Ranch, LLC, in October 2006. (SoF ¶¶ 76-78.) He explains that he purchased the property as a like-kind exchange under Section 1031 of the Internal Revenue Code, meaning that the transaction was strictly controlled and handled through third parties including a broker and a qualified intermediary that processed, documented, and facilitated the funding of the transaction. (SoF ¶ 80.) The Mt. Vernon Property was purchased in the same manner as the Camdenton Property and Neosho Property, using the same broker and qualified intermediary to process, document and facilitate the transaction. (SoF ¶ 81.)

The parties to the purchase transaction of the Mt. Vernon Property were required to execute numerous documents, including a purchase agreement, the warranty deed (Ex. G), and a lease assignment. (SoF ¶ 82.) This assignment was in substantially the same form as the lease assignments executed in conjunction with the earlier purchases of the Camdenton Property and Neosho Property that were also 1031 exchanges handled by the same broker and qualified intermediary. (SoF ¶¶ 81, 83, 86.) Other than a change in the date, the property address and the identification of the assignee, the assignment for the Mt. Vernon Lease was identical in substance and form to the assignment for the Neosho Lease, which was also with Bull Creek Ranch through the owner of that company, Richard T. Gregg. (SoF ¶¶ 84-85.) For comparison sake, the warranty deeds for each of the three properties are also substantively identical except for changes in the names of the parties, the dates of the transaction, and the legal description of the properties. (*See* Exs. B, D and G.) This corroborates Plaintiffs' contention that the assignment for the Mt. Vernon Lease would be in substantially the same form as the assignments for the other two leases.

Plaintiffs have presented cogent, undisputed evidence sufficient to meet the clear and convincing standard for proving the lost assignment for the Mt. Vernon Lease. As with the other two leases, Defendants' standing argument should be rejected.[1]

In any event, Missouri law holds that "[t]he parties' course of conduct may lead to the necessary implication that a contractual obligation exists." *Guidry v. Charter Commc'ns, Inc.*, 269 S.W.3d 520, 529 (Mo. Ct. App. 2008). Here, the parties' course of conduct over the last 11 years demonstrates conclusively that they are the true and correct parties to the three leases at issue in this case. The evidence is overwhelming that Plaintiffs are considered to be the landlords on the leases by Defendants and their predecessor tenants (SoF ¶ 87), and there is not a contrary assertion that any other parties have rights as landlords on the leases (SoF ¶ 98). Defendants have paid rent to Plaintiffs throughout the tenancy beginning in 2010. (SoF ¶ 96.) Defendants also have executed numerous agreements with Plaintiffs recognizing them as the landlords under the leases, including assignments and two sets of lease amendments. (SoF ¶¶ 89-90, 94.) Defendants also have made

---

[1] The cases cited by Defendants do not address the rule for proving a lost written instrument and are also distinct on their facts. In *Whispering Oaks Res. Care Fac., LLC v. AT&T Wireless PCS, Inc.*, No. 4:14-cv-1003 (CEJ), 2014 US Dist. LEXIS 149921 (E.D. Mo. Oct. 22, 2014), the court noted that an owner of a property may have standing to sue on a lease but held that plaintiffs lacked standing because the ownership of the property was unclear and in dispute. *Id.* at *8-9 & n.3. There is no similar issue in this case regarding ownership of the subject properties, which is established with the relevant warranty deeds. (SoF ¶¶ 70-71, 73-74, 76, 78 & Exs. B, D and G.) The court further found insufficient evidence of a lease assignment that might overcome the ownership problem, *Whispering Oaks*, 2014 US Dist. LEXIS 149921, at *9 & n.4, but the same problem does not exist here because the lease assignments are provided for the Camdenton and Neosho properties and established by clear and convincing testimony for the Mt. Vernon property.

*Spencer's River Roads Bowling Lanes, Inc. v. Unico Mgmt. Co.*, 615 S.W.2d 121 (Mo. Ct. App. 1981), is similarly distinct because it involved a claim by a purported tenant on a lease with no evidence that the purported tenant had been formally substituted as a party to the lease. *Id.* at 124. The same is not true here, where Plaintiffs' interests in the properties and the leases are sufficiently established for purposes of standing.

agreements with third parties representing that Plaintiffs are the landlords under the leases, including the Asset Purchase Agreement with Table Rock and a refinancing agreement with Wells Fargo. (SoF ¶¶ 88, 105.)

It is disingenuous for Defendants to debate this issue. They have notified Plaintiffs of lease assignments because Plaintiffs are their landlords. (SoF ¶ 91.) There has never been any dispute, disagreement, confusion or lack of clarify about the fact that Plaintiffs are the landlords under the leases. (SoF ¶ 97.) The parties have acted for more than 10 years under the correct and accurate impression that Plaintiffs are the landlords, and until Defendants filed their summary judgment motion, no suggestion had ever been made otherwise. (SoF ¶¶ 98-99.) The standing argument fails under these circumstances.

## II. Manish Patel and Pushpak Patel are Not Entitled to Summary Judgment on Plaintiffs' Theory of Liability Based on Piercing the Corporate Veil

The evidence and law on the veil-piercing theory of liability against Manish Patel and Pushpak Patel are addressed in Plaintiffs' Motion for Partial Summary Judgment (Doc. #105) and the Suggestions in Support of that Motion (Doc. #106 at 7-13.) As explained in those papers, the Court should enter summary judgment on the theory in favor of Plaintiffs and against Defendants Manish Patel and Pushpak Patel. It follows, then, that Defendants' motion with respect to Manish Patel and Pushpak Patel should be denied.

### A. Veil-Piercing Against CMG Operations, Chalak Mitras Group and Mitra Midwest Operations

Section III.A of Defendants' opening suggestions argues that liability against Defendants CMG Operations, Chalak Mitras Group and Mitra Midwest Operations cannot be established by piecing the corporate veils of the uncapitalized shell companies because those defendants did not control the shell companies. Plaintiffs are no longer seeking to impose liability on CMG Operations

and Chalak Mitras Group in this case because discovery has shown that those entities no longer exist and do not have any assets because they restaurants they used to operate have been moved to a new operating entity (Mitra Midwest Operations) and a new holding company (Mitra Midwest Holdings). Plaintiffs also do not seek to impose vicarious liability on Mitra Midwest Operations because it is directly liable for the alleged breaches of the Neosho Lease and Mt. Vernon Lease as the name tenant on those leases since mid-2013. (Doc. #106 at 5-6.)

Plaintiffs do not oppose an entry of summary judgment accordingly, but it bears noting that Plaintiffs dispute Defendants' assertion that Mitra Midwest Operations has been a fully capitalized entity at all times since it was assigned the Neosho Lease and Mt. Vernon Lease. (Doc. #106 at 19.) This is controverted by the fact that Mitra Midwest Operations did not immediately start making rent payments after taking assignment of those leases. (SoF ¶ 106.) Defendants also have not provided evidence like bank account statements showing when or how Mitra Midwest Operations was capitalized. "Whether a corporation's capitalization is adequate depends on the business of the particular corporation and is generally measured at the time of incorporation." *Real Estate Investors Four, Inc. v. Am. Design Grp.*, 46 S.W.3d 51, 58 (Mo. Ct. App. 2001.) Under the circumstances, a genuine dispute of material fact exists whether the corporate veil of Mitra Midwest Operations can be pierced to impose liability on Manish Patel and Pushpak Patel on the portion of lease liability for which Mitra Midwest Operations is directly responsible.

### B.  Veil Piercing Against Manish Patel, Pushpak Patel and Mitra Hedgehog

Like CMG Operations and Chalak Mitras Group, Plaintiffs no longer seek to pierce the veil of Mitra Hedgehog because the record shows that it now a hollow, defunct entity whose restaurant operations have been moved elsewhere. Plaintiffs do not oppose entry of summary judgment with respect to Mitra Hedgehog on the veil-piercing theory.

But the Court should deny Defendants' motion with respect to Manish Patel and Pushpak Patel, who were the admitted puppeteers behind this entire scheme to avoid lease liability through use of uncapitalized shell companies. The Patels first argue that they have rebutted any inference that they used the uncapitalized shell companies for an improper purpose. This is simply not true. In fact, the record provides clear evidence of the wrongful intent with which the Patels were acting. (103, 108-110.)

It makes no difference that the Patels eventually transferred two of the leases to Mitra Midwest Operations. Even if that entity is fully capitalized so that its veil cannot be pierced (a disputed proposition as noted above), this would not erase the completely separate set of facts supporting the piercing of the corporate veils of the shell companies to impose vicarious liability on the Patels for the period of time that they used the shell companies as named tenants on the leases for clearly improper purpose of avoiding lease liability.

The Patels next argue that the showing of improper purpose must be particularly strong in this case because it involves a breach of contract. Here, as just outlined, the evidence is overwhelming that the Patels acted with an admittedly improper purpose in creating and using shell companies to avoid legal obligations. Moreover, the Patels' argument assumes a scenario where everything in the contractual relationship is above-board. Here it was not. Manish Patel and Pushpak Patel orchestrated assignments of the leases to the shell companies without the consent of Plaintiffs under a loophole in the leases. (SoF ¶ 92.) Defendants did not seek or obtain consents from Plaintiffs before making these assignments and did not even bother to inform Plaintiffs of the assignments until almost two weeks after they were made. (SoF ¶ 93.) Plaintiffs would obviously have preferred not to deal with the shell companies, but they had no choice because those entities were the named

tenants under the lease by virtue of the assignments made by the Patels to avoid lease liability. (SoF ¶¶ 95.)

These circumstances are not like the cases Defendants cite where parties to a contract voluntarily agree to do business even at the risk of nonpayment by an undercapitalized entity. Plaintiffs were forced to take the shell companies as tenants and there was nothing voluntary or consensual about this. The leases were already set before either Plaintiffs or Defendants became parties to the agreements; there was no negotiating those terms between Plaintiffs and Defendants or otherwise, and there was no "allocation of risk" between Plaintiffs and Defendants. Even for the amendments to the leases, Plaintiffs had no option or leverage because they were stuck with the shell companies as the named tenants under the leases.

The facts of this case closely resemble those in *Real Estate Investors Four, Inc. v. Am. Design Grp., Inc.*, 46 S.W.3d 51 (Mo. Ct. App. 2001), where the court found that the corporate veil of a shell company with "no capital, assets, revenues, bank accounts, or employees" should be pierced when that company existed only to be the "named lessee on the premises." *Id.* at 57. Other cases support this conclusion. *See, e.g.*, *State ex rel. Family Support Div. v. Steak'm Take'm, LLC*, 524 S.W.3d 584, 593 (Mo. Ct. App. 2017) ("Ross Jr. used his control over Steak M LLC to operate and undercapitalized shell corporation to escape liability for paying the debt . . . The second requirement for piercing the corporate veil was met."); *Mobius Mgmt. Sys., Inc. v. W. Physicians Search, LLC*, 175 S.W.3d 186, 189 (Mo. Ct. App. 2005) (finding improper purpose element satisfied when owner "circumvented . . . legal obligations by operating and undercapitalized shell corporation"). The Court's prior summary judgment order in the similar *Wise* lawsuit further supports the holding that the corporate veils of the shell companies should be pierced to impose individual liability on Manish Patel and Pushpak Patel. (*See* Doc. 105-1 at 9-10.)

The Court should enter summary judgment against the Patels on the veil-piercing theory, as explained in Plaintiffs' own Motion for Partial Summary Judgment. If the Court does not grant summary judgment in favor of Plaintiffs, it should find, at a minimum, that no party is entitled to summary judgment and that the matter should be resolved at trial.

### C. Laches Does Not Bar Veil Piercing Liability

Defendants' argument regarding laches is without merit. The underlying claim in this case is a legal claim for breach of contract to which the doctrine of laches does not apply. *Sandobal v. Armour & Co.*, 429 F.2d 249, 257 (8th Cir. 1970) ("Laches is a doctrine ordinarily applied in actions of an equitable nature and is rarely, if ever, invoked as a bar to an action at law seeking damages for breach of contract."). Instead, the contract claim is subject to a ten-year statute of limitations as an action on a writing for payment of money. Mo. Rev. Stat. § 516.110(1); *see also* Order, Doc. #58, at 7-8 (finding that ten-year statute of limitations applies to Plaintiffs' breach of contract claim in this case). Plaintiffs timely filed their breach of contract claim, and "[a]pplying laches within the limitations period would . . . clash with the purpose from which the defense developed in the equity courts. . . . Laches is a gap-filling doctrine, and where there is a statute of limitations, there is no gap to fill." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 137 S. Ct. 954, 961 (2017).

Defendants attempt to differentiate the underlying legal claim for breach of contract from the equitable remedy of piercing the corporate veil, but this is baseless. Defendants cite no case law in which a court applied laches in this fashion. Missouri courts recognize that "[e]quity may not be invoked to destroy an existing legal right." *Littlefield v. Edmonds*, 172 S.W.3d 903, 908 (Mo. Ct. App. 2005). And the Eighth Circuit has long held that "[c]ourts of equity, in considering the defense of laches, while not bound by the provisions of statutes of limitations applicable to actions at

law of like character, usually proceed in analogy with them." *Cunningham v. Pettigrew*, 169 F. 335, 341 (8th Cir. 1909). These authorities compel the conclusion that laches cannot be applied to deprive Plaintiffs of any and all available remedies on their breach of contract claim because the claim was timely filed.

Defendants' argument is essentially that the passage of time should bar the claim because Plaintiffs could have filed suit sooner. But Missouri law holds that "as a general rule the doctrine of laches will not bar a suit before expiration of the period set forth in the applicable statute of limitations in the absence of special facts demanding extraordinary relief." *State ex rel. Gen. Elec. Co. v. Gaertner*, 666 S.W.2d 764, 767 (Mo. 1984). Here, there are no exceptional circumstances. Defendants knew the rent returned to full value on expiration of the second lease amendments and that Plaintiffs had asserted that position in writing soon after the period of rent modification in the second amendments had ended. (SoF ¶¶ 100-102.) And even if Plaintiffs had not voiced objection, laches still would not apply here because there is nothing inherently improper or exceptional in deferring legal action while the statute of limitations remaining pending. Plaintiffs had legitimate reasons for waiting, including fear of the threat that Defendants would close the restaurants if they pushed the issue to hard, especially while the Camdenton Property was under mortgage. (SoF ¶ 107.)[2] Beyond this, Missouri law is crystal clear that "[f]orbrearance is not waiver" of a landlord's claim for unpaid rent. *Star Dev. Corp. v. Urgent Care Assocs.*, 429 S.W.3d 487, 495 (Mo. Ct.

---

[2] Defendants notably misrepresent Plaintiffs' position in making their argument, asserting that Plaintiffs "testified that they did not challenge the modified rent payments because they were afraid the stores would close and the property would lose value." (Doc. #102 at 24.) Tryon P. Sisson testified that Plaintiffs did not push the issue sooner for fear of the restaurants being closed (SoF ¶ 67); he also acknowledged that a store closure might reduce the value of the property, but he *did not* testify that reduced property value influenced his decision not to pursue this action more quickly as Defendants assert (*see* SoF ¶ 68).

App. 2014). If delaying a lawsuit for unpaid rent will not constitute a relinquishment of a claim under the equitable doctrine of waiver, it stands to reason that it would not trigger a laches bar either.

Finally, even if laches *could* apply in a contract action, Defendants would first have to show prejudice for the defense to apply in this case. *See Metro. St. Louis Sewer Dist. v. Zykan*, 495 S.W.2d 643, 656-57 (Mo. 1973) ("Mere delay in asserting a right does not of itself constitute laches; the delay involved must work to the disadvantage and prejudice of the defendant."). Defendants argue they are prejudiced by the delay because they would have closed the restaurants and "turned them over" to Plaintiffs had they known of the rent issue sooner. This is illogical because Missouri law does not allow a tenant this option. *See WEA Crestwood Plaza, LLC v. Flamers Charburgers, Inc.*, 24 S.W.3d 1, 7 (Mo. Ct. App. 2000) (noting a landlord's option upon tenant default to "remain out of possession, treat the lease as subsisting and recover rent"). It is also empirically disproven that Defendants somehow were tricked into losing the ability to close the stores; they did not take this option in 2013 when advised of the disagreement on rent and the lease defaults (SoF ¶ 100-102), or in 2017 when advised again (SoF ¶ 48.)

The only real issue from Defendants' perspective is that Manish Patel and Pushpak Patel stand to be held personally liable for their long-running scheme to avoid lease liability through shell companies. Missouri law is clear that the Patels' complaint about facing liability for their own clear misconduct is not the type of prejudice that laches is designed to avoid. *Zykan*, 495 S.W.2d at 657 ("In short, it is defendant's own breach which has created the present problem, and it reward them for their conduct would be to injure the innocent."). And the Eighth Circuit echoes this sentiment, holding that laches will not apply in the absence of "harmful reliance" and the mere fact "that the

defendant will be answerable in damages if in fact it has breached its contract" is not the type of harm that will support laches. *Sandobal*, 429 F.2d at 257.

There is no basis for applying laches in this case and the Court should reject the defense outright for all the reasons outlined above. Applying laches in this case would also be unworkable. Each new underpayment of rent creates a new cause of action on the leases, *Vogel v. A.G. Edwards & Sons, Inc.*, 801 S.W.2d 746, 755 (Mo. Ct. App. 1990), and Defendants cannot explain how any line could ever be drawn between which claims are barred because too much time has passed, and which are not barred because they are still relatively new. This is further reason why laches should not be applied in this case.

If the Court does not reject the laches argument entirely, it should find, at a minimum, that the defense involves issues of fact that preclude entry of summary judgment in favor of the Patels. In any event, it is not a basis on which summary judgment should be entered for Defendants on the veil-piercing theory of liability.

## III. Defendants are Not Entitled to Summary Judgment on Plaintiffs' Claim for Tortious Interference

Defendants argue that CMG Operations, Chalak Mitras Group and Mitra Midwest Operations cannot be held liable for tortious interference with the any of the leases in this case because they did not create the shell companies used the breach the leases. Plaintiffs do not intend to pursue a tortious interference claim against these entities and do not object to the entry of limited summary judgment disposing of the claims in this respect. Plaintiffs also do not intend to pursue a claim of tortious interference with respect to the Neosho Lease and Mt. Vernon Lease and do not object to entry of limited summary judgment on those claims.

But Plaintiffs also assert claims against Manish Patel and Pushpak Patel for tortious interference based on their use of Mitra Camdenton as an uncapitalized shell company to avoid payment of rent under the Camdenton Lease. (*See* Second Am. Compl., Doc. #57, ¶¶ 108-109.) Defendants make no argument why summary judgment should be entered on this claim.[3] Because Defendants do not challenge this claim, it should remain pending for trial.

## IV. Defendants are Not Entitled to Summary Judgment on Plaintiffs' Claim for Civil Conspiracy

Defendants argue that Plaintiffs' claim for civil conspiracy should be dismissed because it is barred by a five-year statute of limitations. The Court has already addressed this argument at the motion to dismiss stage, holding that the civil conspiracy claim is not a stand-alone claim and (like a vicarious liability claim) draws its statute of limitations from the underlying claim. (*See* Doc. #58 at 14-6.) This is consistent with Missouri case law and practice materials. *See Dean v. Noble,* 477 S.W.3d 197, 206 (Mo. Ct. App. 2015); 34 Robert H. Dierker & Richard J. Mehan, *Missouri Practice Series: Personal Injury and Torts Handbook*, § 16.5 (2020). The Court reached the proper conclusion in its order denying the motions to dismiss and Plaintiffs will not belabor the matter by rearguing the points previously raised. (*See, e.g.*, Doc. #47 at 11-13; Doc. #48 at 7-8.)

Defendants also argue that the civil conspiracy claim fails because the underlying claims also fail. To be clear, the civil conspiracy claim is based only on the breach of contract in Count I, not the claim for tortious interference in Count III. Because the breach of contract claim is perfectly viable, the civil conspiracy claim is viable as well.

---

[3] The only argument Defendants make regarding the tortious interference claim against Manish Patel and Pushpak Patel is in Section IV.B of their opening suggestions, which is limited to the argument that there is no tortious interference "with respect to the Neosho and Mt. Vernon Leases." (Doc. #102 at 26.)

## Conclusion

For the foregoing reasons, Plaintiffs respectfully request that Defendants' Motion for Summary Judgment be denied except where agreed to by Plaintiffs in Sections II.A and III above.

Respectfully submitted,

KRIGEL & KRIGEL, PC

By: _/s/ Stephen J. Moore_
      Stephen J. Moore     MO #59080
      4520 Main Street, Suite 700
      Kansas City, Missouri 64111
      Telephone: 816.756.5800
      Facsimile:  816.756.1999
      sjmoore@krigelandkrigel.com

*Attorneys for Plaintiffs Tryon P. Sisson,*
*Shanon G. Sisson, Tryon N. Sisson*
*and Dolores A. Sisson*

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the foregoing document was filed this 15th day of November 2021 via the Court's CM/ECF system, which shall send electronic notice of the same to the following counsel of record:

**Counsel for the Mitra Defendants**
Jeffrey D. Morris
Nick J. Kurt
Benjamin B. Donovan
BERKOWITZ OLIVER LLP
2600 Grand Boulevard, Suite 1200
Kansas City, Missouri 64108

      _/s/ Stephen J. Moore_
      Attorney for Plaintiffs